K. v V. (2024 NY Slip Op 50460(U))

[*1]

K. v V.

2024 NY Slip Op 50460(U)

Decided on April 18, 2024

Supreme Court, Kings County

Sunshine, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 18, 2024
Supreme Court, Kings County

K., Petitioner,

against
V., Respondent.

Index No. REDACTED

The Law Firm of Brett Kimmel, P.C.
Attorney for Petitioner
By: Brett Kimmel, Esq.
26 Village Green, Suite 754
Bedford, New York 10506
Law Office of Jennifer Marshall, Esq.
Attorney for Child
26 Court Street, Suite 1301
Brooklyn, New York 11242
Garr Silpe, P.C.
Attorney for Respondent
By: Ira E. Garr, Esq.
777 Third Avenue
New York, New York 10017

Jeffrey S. Sunshine, J.

The Court is called upon to determine after an evidentiary hearing whether to grant the petitioner-mother's application to relocate with the parties' fourteen (14) year old daughter from Brooklyn, New York to Los Angeles, California over the respondent-father's objection. The parties stipulated to joint custody with residential custody to the mother in 2013. The parents are [*2]both professional film and television actors. The petitioner contends that the relocation is predicated on existing professional acting contracts with well-known streaming providers which contractually require her to be in Los Angeles for extended months of filming and she contends that her continued professional success depends on relocation. The petitioner contends that her prior attempts to maintain the child's residence in Brooklyn by allowing the child to be in the father's care while she is filming in L.A. were unsuccessful inter alia because the father was unable to provide the level of care that the child needs as she transitions into young adulthood.
 Current Procedural History
The Court heard testimony on August 15, 2023; August 16, 2023; September 8, 2023; September 18, 2023; September 19, 2023; January 29, 2024; January 31, 2024; and February 6, 2024. 
The petitioner filed a post-trial summation dated March 14, 2024 [NYSCEF #49]. The respondent filed a post-trial summation dated March 14, 2024 [NYSCEF #50]. The attorney for the child gave an oral summation, on consent of all parties, on March 18, 2024. 
The Court conducted an in camera of the child, who is fourteen (14) years old, on the record in March 2024, with the attorney for the child present.[FN1]

Prior Procedural History
The parties met in May 2008, began living together in August 2009 and the subject child, "L", was born in September 2009. The parties never married. They separated in December 2010 (Tr. 1/29/24, p. 5) after what they both described as a turbulent relationship.
The mother commenced a special proceeding in Supreme Court in August 2012. Thereafter, the parties settled issues of custody and parenting time by a Stipulation of Settlement of Custody and Parenting Time, dated March 29, 2013 ("Custody Stipulation") in which they consented to sharing joint legal custody of L with primary residential custody to petitioner-mother (Exhibit "JN1"). 
There is currently a child support order pursuant to consent stipulation between the parties, dated March 30, 2016, whereby the father pays child support to the mother [Judicial Notice 2].
Pursuant to the Custody Agreement (JN1), respondent has parenting time with L one afternoon each week and alternating weekends beginning after school on Friday through Sunday at 6:00 p.m. and for the parties to share holidays and school recess periods with each party is entitled to two (2) uninterrupted weeks for vacation during the summer recess. 

The Parties
The father is fifty-three (53) years old. The father married in May 2015 and he lives in Brooklyn with his wife and their son, T., who was born in August 2016 (Tr. 1/29/24, p. 8). The father testified that his wife is a managing director for a hedge fund company and works 9:00 a.m. to 6:00 p.m. during the work week and that he is primarily responsible for the daily child-care needs of the child of that relationship (Tr. 1/29/24, p. 9) and for taking care of L when she is in his care.
The mother is approximately fifty-three (53) years old [FN2]
and she had a son, J, from a prior relationship who is currently nineteen (19) years old. The mother, J., and the parties' child, X, live in Brooklyn, New York approximately a 20-minute walk from where the father lives with his family. The mother testified that L and J are "very, very close" [Tr. 8/16/23, p. 122].

The Parents' Professional Acting Careers
The parties were professional actors when they met, and they each continue to earn their livings as professional actors in film and television. Both parties have worked in Los Angeles, California and elsewhere throughout their careers and have each appeared in numerous successful, long-running television series. The father testified that his most financially successful experience was on a network television show from 1998 to 2007 where he was a series regular (Tr. 1/29/24, pp. 12-13). He testified that he continues to work in theater, appear in television shows and movies and that he does voiceover work.
The mother testified that her acting career opportunities vastly improved in November 2018 when she was hired as a regular on a well-known streaming service television series that is produced in L.A. [Petitioner's Exh. 1]. At that time, the father was also working on a television show being produced in L.A. The mother testified that the father refused her request for X to join the parties in L.A so X stayed with her stepmother, the father's wife, in Brooklyn. 
It is undisputed that the mother's acting career opportunities have continued to improve since that time. The mother contends that this improvement to her professional career and her improving corresponding financial situation are very important to X because, she alleges, she and X have not always had financial stability for which she appears to place blame on the father; however, there does not appear to be any allegation that the father has not complied with the terms of the parties' stipulation of child support from 2016. It appears that the father's career, while active, has not escalated to the success level of the mother's career currently, although several years ago he appeared in a highly popular network television series for a few years.

Communication Between The Parents
Both parties testified that communication between them was challenging but for different reasons. The father appears to view the mother as controlling and/or overwhelming with how much information she provides. The mother appears to view the father as unresponsive and/or obstructionist. 
It appears undisputed that the parties' communication is limited to e-mail. The mother testified that the father will not answer her phone calls and does not meet in-person with her (Tr. 8/16/23, p. 155). The father did not dispute this testimony and conceded that he does not speak with the mother directly and that he often does not respond to her e-mails.
The mother testified that over the years she has made efforts to include the father in activities such as family dinners with her and X but that he "refused" (Tr. 8/16/23, p. 156) and that the parties have "never" had a joint conversation with X in the last ten (10) years (Tr. 8/16/23, p. 157). The father did not dispute this testimony and offered no testimony about any ways in which he has attempted to support the relationship between X and the mother. 
The mother testified that she was primarily the one who handled day-to-day care for X including scheduling her appointments for health care and grooming and speaking to her [*3]teachers. She testified that she made diligent efforts to keep the father involved in all of these efforts but that it was difficult to co-parent with him because he was often non-responsive sometimes waiting months to respond to her e-mails seeking input from him and that when he does respond he is often critical of the options she presents but that he rarely provides alternative options or offered to take an active role in obtain solutions. 
She stated that she understood her obligation was to "confer and to consult with him and to negotiate in good faith" and that she did so but that "[h]e did not want to discuss it, he dismissed it. There was no negotiation, there was no discussion" (Tr. 9/18/23, p. 94). 
The mother asserts that she attempted to have the father join her in co-parenting therapy hoping to improve their communication (Tr. 8/01/23, pp. 156-158) but that those efforts were unsuccessful, and the parties ended up doing a few separate therapy sessions with the therapist related to the relocation issue but that it was not successful (Tr. 8/16/23, p. 159). 

 Parties Attempts to Adjust Parenting Time To Accommodate Careers
Notwithstanding the strained communication between the parents, it is undisputed that the parties have each, at times, adjusted their parenting time with X during periods when their acting careers took them out of New York City for filming. 
The father concedes that X has lived with him much more than was anticipated in the custody agreement since the mother started working more in LA in 2018 (Tr. 1/29/24, p. 46). The mother testified that it was challenging to stay in contact with X during this time when she was in LA and X was in Brooklyn with the father (Tr. 8/16/23, p. 146) because the father did not facilitate communication between her and X and X was, in effect, too young at that time to have her own telephone or to communicate directly with her. 
The mother testified that while she was filming for season one of that series, from November 2018 to May 2019, the parties agreed that X would stay with the father in Brooklyn and that she would travel back-and-forth to New York to see X and that X would travel to LA to see her a few times. The mother asserts that she maintains daily contact with X while she is out of town working (Tr. 8/16/23, pp. 151-154). The mother testified that this period was the first time X had spent continuous months with the father. 
It is undisputed that the mother returned to New York when filming was over in May 2019 and that X resumed residing with her and enjoy parenting time with the father in accordance with the parties' 2013 custody agreement. The parties agree that this has been their routine during X's childhood when one or the other has been out of town working.

Mother's Objection to X Remaining in Brooklyn With The Father
The mother testified that while the father has a good relationship with X he does not have a level of communication or awareness about X's emotional and developmental needs and as X reaches certain teenage milestones the father is unable to provide adequate care and that X's mental and physical well-being deteriorates when she is in the father's primary care for long periods of time. 
The mother testified, essentially, that initially she attempted to leave X in the father's primary care when she had to work in L.A. but that despite those efforts the father was unwilling or unable to recognize when X needed medical, mental health, dental and other services and interventions. As such, the mother testified that it is impossible for her to leave X in the father's primary care without jeopardizing X's best interest. 
The mother also testified that even when she tries to facilitate these services and interventions for X. the father is often unresponsive to her solicitations for input or that he [*4]objects to the providers she finds for X but that he does not propose alternatives. She testified, in effect, that this was an on-going course of conduct by the father: he relied on her to take care of X but that when he objected to the options, she found he did not offer to participate or offer alternatives but rather he continued to insist that she handle logistical arrangements (9/18/23, pp. 58-61). In effect, she contends that the father stonewalls her attempts to oversee necessary logistics for X from L.A. and that he does not take necessary steps to provide necessary care for X while she is in his primary care during times when the mother is working in L.A. 

2019
The mother testified that in 2019 X started exhibiting "some real social anxiety" (Tr. 9/18/23, p. 45) and that this challenge appears to increase when X is living with the father. She asserts that in 2019 she was working in L.A. and X was residing with the father when she started receiving text messages from X, who was then ten (10) years old, that caused her to be concerned about X's mental health (Tr. 8/16/23, p. 173-176), including a text on October 8, 2020 (Petitioner's Exh. 3) and another on June 28, 2023 (Petitioner's Exh. 14).[FN3]

The mother testified that, in response, she arranged for X to see a therapist but that after a few months the father unilaterally ended the child's therapy sessions without the mother's knowledge or consent and without seeking another therapist for X so when she learned that X was not receiving therapy, she immediately sought out another therapist but that the father did not participate. 
She also testified that starting in 2019, X's personal hygiene has been a repeated concern when she is living for extended periods of time with the father (Tr. 9/18/23, p. 53) and that "when she went to summer camp in 2019, she cut out a big swatch of, two big swaths of her hair and that caused me great concern. That is not   that was in my opinion as a mother it was out of character for her" (Tr. 9/18/23, p. 45). 

February 2020
The mother testified that she returned to L.A. in February 2020 to begin filming season 2 of the streaming service series and once again the parents planned for X to live with the father until filming was scheduled to end in or about June 2020. The then COVID travel restrictions and health concerns made the mother's return from L.A. to Brooklyn impossible due to the COVID-19 pandemic. She testified that she was unable to return to Brooklyn until May 2020.
She testified that in May 2020 she traveled from L.A. to New York and took her son and X back to L.A. At that point, she testified that X continued attending her New York public school virtually from L.A. through the 2019-2020 academic school year. The mother contends that she sent the father videos of X "to make sure he knew that I was thinking about him and his concern for X's well-being" but that the father did not reach out or communicate with X or travel to L.A. to see her except for one (1) week (Tr. 9/8/23, pp. 164-67; 9/18/23 pp. 49-51). The father did not dispute the mother's testimony that he has not been consistent in maintaining contact with X outside of his scheduled parenting time. 
The mother also contends that when X was younger the father did not facilitate communication or daily contact between her and X during his parenting time. She contends that she has consistently facilitated contact and communication between the father and X
The mother contends that when it was evident that New York City public schools would continue functioning virtually for the 2020-2021 school year due to the then ongoing pandemic safety protocols she reached out to the father seeking to keep X in L.A. but that the father never respond to her directly and instead she received correspondence from the father's attorney demanding that she return X to New York (Tr. 8/16/23, pp. 167-169). The father offered no explanation for why he retained counsel and refused to respond to the mother. The mother contends that this is a continued course of conduct by the father of rigidly insisting on his way and refusing to communicate with her in a meaningful way about important logistics involving X. 
The mother returned with X to New York in August 2020 and the parties resumed their parenting schedule from the 2013 stipulation. The mother stayed in Brooklyn until October 2020 when she had to return to L.A. to continue working leaving X once again in the father's care in Brooklyn.

Christmas Recess 2020
The mother testified that she worked in L.A. from October 2020 until December 2020 and when she returned to New York in December 2020 for X's winter recess she observed that XL "did not look like herself" and appeared to be struggling emotionally and with her personal hygiene to such a degree that she was "scared for my daughter" [9/18/23, pp. 55-61) and worried that X may "harm herself" (Tr. 9/08/23, pp. 293-294).
According to the mother it appeared that X, who was 11 years old at the time, was not receiving grooming assistance and she had a "very strong body odor" (Tr. 9/18/23, p. 52) because X was not receiving what she believed was necessary guidance from the father for how to care for her body as she transitioned through certain hormone developments. The mother also testified that X was struggling with her hair and that " . . . it isn't easy to figure out how to manage your hair and all of its iteration as a young black girl" and that "the hair for African-American girls requires a kind of care and attention on a daily basis" so having someone to assist her has been important (Tr. 9/18/23, p. 117). 

Ophthalmology
She further testified that she had previously noticed that X had a lazy eye and had taken her to an ophthalmologist where she received an eye exercise program and started wearing glasses (Tr. 9/18/23, p. 55) but that when she saw X over Christmas 2020 the lazy eye had deteriorated and she believed that X was not getting the support she needed with the eye exercises from the father. The father did not dispute the mother's testimony about X's lazy eye or eye exercises.

Dental Needs
The mother testified that in December 2020 she noticed that X had a "tooth coming in on the side of her gum) and she arranged to have the tooth removed (Tr. 8/16/23, pp. 177-178). The mother said that she noticed the tooth when talking to X and that the tooth was "on her upper right-hand side" and that it "was brown" (Tr. 9/18/23, p. 55). The father did not dispute the mother's testimony. The mother also testified that she was solely responsible for obtaining orthodontia for X (Tr. 8/16/23, p. 192).

Physical Aggressiveness
The mother testified that in December 2020 she observed that X had become physically aggressive toward any demonstration of physical affection (Tr. 9/18/23, p. 57-58) including hitting extremely hard if the mother or her older brother, J., tried to be affectionate with her. The [*5]mother thought that this was a dramatic change from how X behaved prior to living with the father while she was in L.A. She averred that prior to living with the father from October 2020 to December 2020 that X was "very sociable. She was emotionally stable. She was affectionate. Before this period, before she stayed with her father she didn't have a level of anxiety" (Tr. 9/18/23, p. 58). 

January 2021-June 2021
The father testified that the mother took X back to L.A. with her in January 2021 without his knowledge or consent which resulted in him having to engage counsel to seek X's return to New York. The parties ultimately resolved the issue in a written stipulation allowing X to stay in L.A. until June 2021 (Tr. 1/29/24, pp. 17-20) and would then return to Brooklyn and the mother would obtain housing in Brooklyn (Tr. 8/16/23 pp. 181-82)(Petitioner's Ex. 2). The father testified that he believed that because of this 2021 agreement the mother was going to return to live in Brooklyn and that the parties were agreeing to continue the parenting schedule in the parties' 2013 stipulation and that X would reside with him in Brooklyn whenever the mother had to be in L.A. to work. 
The mother testified that she was, in effect, justified in taking X to L.A. because she was concerned about X's mental and physical "deterioration" without the father's consent. 
During that time X had two (2) visits with the father, each for a few days and that the mother testified that she brought X from L.A. to New York City to have a week visit with the father but that he was unable to see X much because he had a job that conflicted with the time (Tr. 8/16/23, p. 182). The mother testified that from December 2020 through June 2021 she facilitated contact between X and the father by sending videos and pictures but that the father made little to no effort to communicate with X directly (Tr. 8/16/23, pp. 182-85). 

July 2021-July 2022
The mother returned from L.A. to New York and lived with her older son, J., and X in a Brooklyn apartment from July 2021 into July 2022 and X resumed parenting time with the father in accordance with the parties' 2013 custody agreement schedule. In July 2022, the mother returned to L.A. to start filming a third season of the well-known television show which was scheduled to film from July 2022 through January 2023. The mother testified that with easing pandemic restrictions she was able to return two (2) to three (3) times each month to spend time with X in Brooklyn. The mother noted that she continued to be the parent responsible for all logistics arrangements for X including scheduling appointments, interfacing with X's teachers and coaches.

Tennis
The father contends that X has taken weekly tennis lessons for nearly a decade since she was five (5) years old that he takes her to each week (Tr. 1/31/24 pp. 82-83; 102; 104). The mother testified that MS has a "award championship tennis team" (Tr. 9/18/23, p. 77). In his testimony, the father dismissed the value of the tennis program at MS asserting that X has never participated in competitive tennis so the opportunity to do so at MS was, in effect, irrelevant to X. The mother testified that X has not participated in competitive tennis in the past because she had not had opportunities to do so in the past.
During the trial there was testimony that after being enrolled in tennis for approximately nine (9) years the father had not yet enrolled X in tennis for the Spring 2024 program. The father testified that he would enroll X in tennis once he knew what the mother's work schedule would be for that time period because, he testified, "I think it's a little unfair for me to schedule [*6]X's spring tennis without knowing [the mother's] availability" [Tr. 1/31/24, p. 83]. The father testified that he has not had any conversations with X about her interest in continuing tennis or how to schedule any continued tennis lessons (Tr. 1/31/24, p. 103-104). It appears that X was eventually re-enrolled in tennis during the trial.

High School Selection: Fall 2022
The mother testified extensively about her efforts to assist X with New York City public high school applications and the lottery school selection process. She noted that she began looking at and visiting high schools with X in 2022 including touring numerous public and private schools in New York City and in Los Angeles, talking to school administrators and parents at these schools and looking at independent reviews of these schools (Tr. 9/08/23, pp 224-225). She testified that she understood the complexities of the high school selection process because her older child had been through it a few years earlier and was now looking at college admissions. She felt that picking a suitable high school for X was important because she understood the potential impact on college admissions and testified "I thought it was very important that she had options to get the best education that I can provide for her" (Tr. 98/23, p. 222) and that she sought the father's input in the high school selection process but that he declined to participate in a meaningful way (8/16/23, pp. 194-195) until November 2022 (Tr. 9/18/23, pp. 94-103), refused to consider any schools outside New York City, to do any research on possible schools or to speak with anyone at possible schools. The father testified that he worked with the mother to rank-order possible high schools for X and conceded that he refused to consider any high school outside New York City and did not want to consider any private high schools in New York City.
X graduated from middle school in June 2023. She was accepted into two (2) schools in L.A. and one (1) high school in New York City which was her first rank-order choice public high-school (Tr. 9/8/23, pp. 312-313). 

 Public vs. Private School
The mother testified that throughout X's school age years the father was not supportive of efforts for X to attend private school. The mother asserted that she did not explore private middle schools for X because at the time X was looking for middle schools the father objected to the financial cost, and she was not in a financial position to pay for private tuition. She testified that now she is in a financial position to pay for the cost associated with private schooling for X and that she believed a private school education will provide X with the best possible educational opportunities in the future (tr. 9/18/23, p. 82).
The father testified that he attended a private parochial elementary school and then transferred to a public high school in New York City before attending a New York State college and then earned a Masters of Fine Arts from New York University (Tr. 1/29/24. P. 4). He testified that he believed that he did not feel that he got "the best experience culturally" from attending private school (Tr. 1/31/24, p. 6). He readily admitted that his son with his current wife attends private elementary school because his wife "insisted on it" and that she alone pays for that tuition (1/31/24, p. 6-7) because he preferred public school education for his children.

New York City Public High School (referred to herein as "NYCHS")
The mother testified that she initially did not object to the father's choice of a specialized New York City public high school ("NYCHS") but after she toured the school two (2) times and after X's behavior started to change in the father's care her opinion shifted (tr. 9/18/23, pp. 65-70) and she no longer believed that the specialized NYCHS was an ideal fit for X because it is a [*7]very large school focused on helping students obtain employment as artists directly out of high school and does not have as strong a college preparation program as some other schools (Tr. 9/08/23, p. 233). She testified that the specialized NYCHS has more than 1,500 students and only two or three college counselors, very few AP classes and no "consistent connections to higher level of colleges that X might want to or have the opportunity to go to" (Tr. 9/08/23, p. 234-235). She asserted that she was concerned that X would "get lost" in such a big school environment (Tr. 9/8/23, p. 235) because X had not demonstrated herself to be the type of student who sought out extra assistance from teachers.
She said that the father was not responsive to her communications about the specialized NYCHS not being a great fit for X (Tr. 9/8/23, pp. 232-42; Petitioner's Ex. 7). She noted that NYCHS had no athletic programing for X and that the commute would require nearly an hour and would include several subway changes (Tr. 9/8/23, p. 229). 
The father testified that NYCHS is an excellent high school for X because she is maintaining a strong grade point average and because the students look and dress like X and that the school is "colorful", feels "safe", has a lot of diversity and that the students "vibe" like X (Tr. 1/29/24, p. 33-43) wearing similar clothing and brand of backpacks. The father did not offer any testimony about the curriculum or how the school prepared X for future opportunities, but he offered photographs of the interior of the school, posters and announcements.
The mother testified that she did not believe that X wanted to attend NYCHS because part of the admission process for NYCHS included a portfolio review and that L was not enthusiastic about completing her art portfolio. She testified that it was "like pulling teeth" to get X to work on the portfolio (Tr. 9/8/23, p. 236-237). There appears no dispute that the father, in response to the child's reluctance to complete her portfolio for the admission process to NYCHS, helped her put together her portfolio (Tr. 8/16/23, p. 199). 
X was admitted to NYCHS for the 2023/2024 school year and has been attending during the ongoing proceeding.

 MS: Private High School in L.A.
The mother testified that she wants X to move to L.A. so she can attend MS, an all-girl, private school. She testified that she toured MS four (4) times, including three (3) visits with X (Tr. 9/08/23, p. 222). The mother prefers MS to NYCHS because she states that MS has a small class size and a high teacher-to-student ratio and because the school was located just minutes from her home in L.A., has a strong athletic presence and art studio and what she characterized as "an extraordinarily college preparatory curriculum" including many AP classes (Tr. 9/8/23, pp. 242-44).[FN4]
She testified that "many of the girls that graduate from that school go to some of the best colleges in this country" (Tr. 9/8/23, p. 244).
The mother testified that throughout X's life she has observed that X thrives in all-girl environments and takes on more leadership roles in these environments (Tr. 9/18/23, pp. 70-74).
X was accepted into MS for the 2023/2024 school year but has not attended nor was she [*8]enrolled given the ongoing proceeding. The mother testified that her enrollment offer for MS remains open for the 2024/2025 school year (Tr. 9/8/23, pp. 152-52). 
The father contends that the mother's insistence that X attend MS has less to do with the educational opportunities at MS and is more about MS being just a few minutes away from the home the mother purchased in L.A. He testified that X is thriving at NYCHS (Respondent Ex. L). He contends that many of the amenities the mother praised about MS are not things that interest X and are certainly not a legally sufficient basis for removing X from Brooklyn and a meaningful relationship with him. 
The father contends that MS lacks the diversity of X's current and prior public schools (Tr. 1/29/24, p. 48). He testified that X living and learning in ethnically and racially diverse environments has always been important to the parties (Tr. 1/29/24, p. 33). He testified that "I have strong concerns about the - there's a cultural diversity aspect of it, but there's also a socioeconomic element that concerns me. It seems like a fancy school and it feels like a school full of wealthy kids and that's just not been her New York experience and it's not been her New York public school experience. I don't see how she fits into that" (Tr. 1/29/24, p. 48). 
The father also questioned, in effect, that X may lack the academic aptitude to perform well at MS because she had not always historically performed well on testing. The mother testified that she does not believe that X's tier placement within the New York City public school system adequately reflects X's academic aptitude and that she will be able to flourish academically if in an environment more suited to her personal needs (Tr. 9/18/23, p. 79). She testified " . . . it is my belief that L needs to be in an environment where she can explore other academics and I don't think that has yet been made available to her. But she has the opportunity to do it at MS" (Tr. 9/18/23, p. 79). 
The mother contends that the father refused to visit MS even when he visited X in L.A. (Tr. 1/31/24, p. 31; Petitioner's Ex. 15) The father conceded that he never visited the school and that he has never spoken to anyone at MS (Tr. 1/31/24, p. 31-32) and readily admitted that he refused to visit the school because he was not going to consider any school for X that was outside New York City. 
The father testified that while he believes that L's opinion about where she attends school is important, he also "wasn't going to engage in discussions about schools that were outside of New York" and that he never spoke to L about where she wanted to go to school because "I felt strongly about X not attending school in California . . . " (Tr. 1/31/23, p. 90). Throughout his testimony, the father readily admitted that he steadfastly refused to consider any option for X's high school education that was not the choice of the specialized NYCHS.

 Parenting Time
X resides primarily with the mother. The father has regular parenting time with X. During times when the mother has worked in L.A., X has spent extended periods in the father's care and custody. When the mother returns to New York City, the parties have returned to the parenting time schedule in the 2013 custody and parenting time agreement.
The mother testified that she is willing to continue to cultivate a meaningful relationship between X and the father (Tr. 9/8/23, p. 265) and that she believes having some separation may improve their relationship.

January 2023 — current
The mother testified that X has resided with her and her son in Brooklyn since January 2023. She said no filming for the television show took place during 2023 due to the then [*9]existing writer's strike but that her acting role has been exercised for season 4 of the well-known streaming network television show and that filming is expected to begin in July 2024 and continue through the end of the year. 

 The Well-Known Streaming Service Series
The mother testified that both she and the television show have received numerous awards for excellence in television (Tr. 2/6/24, pp. 58-60). She contends that this show has been critically acclaimed and continues to be well-received and is on-going.

 The Mother's Additional Opportunities in L.A.
The mother contends that her work obligations and opportunities in L.A. are steadily increasing including continuing acting work as a regular character on another series as a series regular on well-known streaming service series productions that will be produced in L.A. where she will earn $165,000 an episode ($1.32 million in total) (Tr. 2/6/24, pp. 55-68). 
The father contends that most of the mother's testimony regarding her career advancement opportunities in L.A. are speculative and even if true they relate to her professional best interest and have little bearing on X's best interest. He contends that the mother was able to develop her career while residing most of the year in Brooklyn so she can, in effect, continue to do so until X leaves to attend college in three (3) years. He continues, in effect, that any temporary inconvenience should be placed on the mother and not on X.

The Father Opposes Relocation
The father testified that the mother failed to demonstrate that relocating to L.A. would be in X's best interest. He contends that L, relocating to L.A. would not be in her best interest because it would interfere with her relationship with him and undermine stability for X's life in New York including her family (the father's current wife; their son, T.; and the paternal grandmother who the father testified suffers from dementia); school (where X has started and nearly completed her freshman year); friends; and doctors. He testified that the mother has left Brooklyn for periods of time to act in other locals (9/8/23, p. 305-306) and always left X in his care and custody and that she can continue to do so. He testified that X should remain in New York and that the mother should have parenting time with X in New York when she is between filming and that X should be in his care the rest of the year. He testified "if [the mother]'s filming four to five months out of the year she can thereby be in New York seven to eight months out of the year. It's easier for [the mother] to have her parenting time in New York with [X] seven to eight months out of the year than it is for me to go to California — where I don't have a residence. I don't have a home — to try to be with X for seven to eight months out of the year" (Tr. 1/29/24, p. 30).
He averred that uprooting X from Brooklyn and compelling her to re-establish herself in L.A. at a new school and to make new friends would be "a lot . . . at this point in her life" (Tr. 1/29/24, p. 31). He testified that X remaining in Brooklyn would maintain continuity in L's life (Tr. 1/29/24, p. 29-30).
He asserted that there is no guarantee that the mother's career will continue to require her to spend so much time in L.A. and that forcing X to relocate to L.A. would require her to start a second high school rather than remaining in the specialized NYCHS. He contends that if the mother is permitted to relocate with X to L.A., he will be deprived of his ability to be present for school conferences, events, celebrations, activities, and day-to-day moments with X. 

August 2023 Summer Vacation Parenting Time
The father testified that despite providing notice to the mother in early May 2023, in [*10]accordance with the terms of the parties' 2013 custody and parenting time agreement, that he would take his two-week summer vacation with X starting on August 20, 2023. He stated that when he arrived at the mother's apartment on August 20, 2023, to pick up X he learned that the mother had taken X on a trip out of the State of New York without prior notice to him as required by the parties' custody agreement (Tr. 9/8/23, pp. 319-323; Tr., 1/29/24, p. 22). He testified that the mother did not return X to Brooklyn until August 23, 2023 (Tr. 1/29/24, p. 26).
The mother testified that she was "confused" about how the summer vacations would be handled because of the ongoing litigation and that she offered to give the father additional time with X. The mother did not dispute that she had failed to notify the father that she was taking X out of New York State.
The father contends that it will be impossible for him to continue to have a meaningful relationship with X if his parenting time is limited to visits to L.A. and having X spend summers with him in Brooklyn if she has new friends and opportunities in L.A. He testified that allowing the mother to relocate with X to L.A. would effectively terminate the parenting time and custodial provisions of the three (3) agreements the parties entered into over the years all of which, he contends, contemplate the parties continuing a coparenting relationship in New York. He testified that the mother rents an apartment in Brooklyn and owns a home in L.A. so she can easily travel back and forth for parenting time with X but that he does not have a home in L.A. so it would be difficult for him to have parenting time with X in L.A. with any regularity given his obligations to his current wife and child and his elderly mother.
The father contends that uninterrupted summer vacations in lieu of regular weekly parenting time is not a tenable solution for maintain his relationship with X because, if allowed to relocate, X may start to build social commitments and community in L.A. and not want to leave California if she is living there and building a life there and new relationships and experiences there and that if he is required to go spend three (3) months in California to see X that it will interfere with his new family. He contends that such a schedule where X is required to "drop all of that" and return to New York for extended school breaks "puts both of us, myself and X, in a difficult bind as it relates to trying to continue to foster . . . our father daughter relationship" (Tr. 1/31/24, p. 10). He contends that he "still has to work" (Tr. 1/31/24, p. 10) and that if his only parenting time with X was during the summer that he "would have to consider not taking work" during the summer which, he contends, "is actually a busy part of the year in the industry" (Tr. 1/31/24, pp. 10-11). 

The Mother's Position
The mother believes it is in X's best interest to continue residing with her as the primary residential parent because she believes the father has demonstrated an inability or unwillingness to take care of X at this stage of her life. The mother proposes that if she is allowed to relocate with X that X be able to spend extensive uninterrupted parenting time with the father including summer vacations [Petitioner's #10]. The mother testified that she would pay for the tuition and costs associated with MS in California and would pay for travel costs for X traveling between L.A. and New York for L to spend parenting time with the father (Tr. 9/08/23 pp. 257-258). The father conceded that he travels to Los Angeles and elsewhere occasionally for work and other social events (Tr. 1/31/24, pp. 30-35) and testimony at trial revealed that the mother had facilitated parenting time between X and the father during trips to L.A. 

 Communication Between the Parties
On cross-examination by the attorney for the child, the mother testified, in effect, that given her past relationship dynamic with the father that she believed it was important for her to, in effect, "shield" the daughter from the father who she views as having a "volatile" temper (Tr. 9/18/23, pp. 89-90).
The father testified that the mother was sometimes dismissive of him and that on two (2) occasions in May 2022 responded to him in e-mails using impolite language (Tr. 8/18/23, p. 7; Exh E; Tr. 9/8/23, p. 326). The mother acknowledged that these responses to the father were improper, that she had apologized to him and that those e-mails were not reflective of her typical character towards him. Both parties testified that their communications with one another had, at times, been strained.
The mother testified that she has not told X anything about the father's treatment of her during their past relationship, which she believes included acts of emotional, verbal and physical domestic violence, but that during Christmas 2022 the father demonstrated his behavior towards her in front of X.
The mother testified that when the father was picking X up for his Christmas parenting time he stood outside the mother's residence "yelling and screaming" in an "aggressive and antagonistic" manner (Tr. 9/18/23, pp. 90-91). She testified, in effect, that the father is unable to keep his personal feelings about her from influencing his behavior around X. The mother concedes that at time her feelings about the alleged past dynamic between the parties prior to their separation in 2012 has resulted in poor judgment in language in e-mails to the father. The father did not dispute the mother's testimony about this incident.

 Witness Ms. H.H.
Petitioner called Ms. H.H. as a fact witness. Ms. H. testified that she has been a friend of the mother for more than 35 years and that she has two (2) children who are similar ages to the petitioner's children. Ms. H's youngest child, a daughter, M., is the same age as the petitioner's daughter, X, and that the daughters have been friends their whole life, have a close on-going relationship and, at times during the pandemic, shared the same "safe pod" during the pandemic.
Ms. H testified that she and the petitioner and their children saw one another several times during the COVID-19 pandemic. She testified that X appeared to be experiencing "hygiene" challenges at times during the pandemic as she was entering puberty and that she and the petitioner discussed constructive ways to help X address these developmental milestones. She noted that while X is normally "engaging" but that at times during the pandemic when the father dropped her off for visits that X appeared unusually reserved.

 Witness: Mr. BK
Petitioner called Mr. BK as a fact witness. Mr. BK has been the petitioner's talent agent since 2007. He testified that the petitioner had "paid her dues" with regional acting jobs from 2007 until 2014 when she had a "big changing point" and "was better known and she was more respected" (8/15/23, p. 72). He testified that from 2014 until 2018 the petitioner had some recurring roles on established shows on network television and on a well-known streaming service earning $10,000-$13,000 per episode but that in 2018 she was picked up as a multi-episode series for a well-known streaming service series where she earned $40,000 per episode for the first season (8/15/23, p. 76-77). 
He testified that as a series regular the actor or actress is contractually "obligated to be available to be called into work for the entire season" (8/15/23, p. 78) which means that the petitioner is required to be "on call" to work and must stay in the area unless given permission to [*11]leave.
He testified that, in 2019, prior to the third season, there was a renegotiation of the contract based on the popularity and success of the show and the petitioner was earning $125,000 per episode for the third season and $150,000 for the fourth season (8/15/23, p. 79-80). He testified that the petitioner is contracted for a possible four (4) more seasons and that she must be "on first call available" in Los Angeles because the shoot schedule is "often volatile and changing" and that she has to "ask for permission for time away" (8/15/23, p. 81) and that if she was not in Los Angeles when called she "could be sued for breach of contract" and her "reputation would suffer a pretty bad blow" (8/15/23, p. 82).
He testified that based on his professional experience the petitioner had reached a part of her career where "being in Los Angeles in the hallways and restaurants and networks and being able to have meeting in person with the main buyers and movers and shakers" was important (8/15/23, p. 85). He testified that he believes it is beneficial for the petitioner's career for her to be located full-time in Los Angeles (8/15/23, p. 88) especially related to the petitioner's ability to expand her career into writing and pitching her own series and movies which she is presently doing. His view was this was the natural progression of an actor as their career enters a new, more successful stage.

Mother's Attempt To Leave Her Contract in L.A.
The mother testified that in response to what she saw as X's struggles living with the father in New York City without her she attempted to get out of her contract two (2) times — first in July 2021 and against in February 2022  despite recognizing that if she was released from her contract it would detrimentally impact her financial earning capacity (Tr. 9/18/23, p. 121-122). She testified that her requests to be written out of the show so that she could return to New York, but she is contractually bound to remain on the series (Tr. 9/18/23, p. 93) 
On cross-examination, when question about whether she was putting her career before the best interests of the daughter, the mother testified that:
. . . I am a working mother . . . and as a working mother I can have a job and also support my daughter. What I am requesting the Court to do is to allow me to be physically present in my daughter's life to relocate to Los Angeles on behalf of supporting her. I think it is in her best interest. I am not putting my career over my daughter. My daughter is very, very important to me. And the truth of the matter is over the last few years it has become clearer to me that my daughter needs to be physically present with me, that she thrives with me, that she absolutely should be able to visit with her father and have meaningful contact with him but she needs to live with me in Los Angeles. (Tr. 9/18/23, pp. 112-113).

The Father's Lack of Direct Involvement in the Child's Medical Care
The mother testified that the father is slow to respond or non-responsive to requests to participate when it came to scheduling routine medical care appointments for X and that he is not observant of X's changing needs and is unable or unwilling to take proactive action to obtain services and treatments for X to address any issues that come. In support, she points to past dental, ophthalmological, and dermatological needs X faced while in the father's care when the mother was in L.A. that she alleges the father did not identify or treat.
The father testified that he could provide all the daily care for X; however, he did not dispute the mother's testimony that she makes all of X's medical appointments. The father [*12]criticized the mother alleging that she does not provide him with notice of X's medical appointments. 
The mother contends that she informs the father of X's appointments but that the father, in effect, stonewalls her efforts to include him. E-mails in evidence show that the mother provides summaries of X's appointments when the father is not there including specific information about vitals such as blood pressure as well as general observations about how she saw X experience the process such as how X appeared after a blood draw, etc. [Petitioner's Exh. 19] which indicate that the mother has strived to keep the father thoroughly informed of information about X's health and well-being as she receives it. In support of the mother's position, numerous e-mails were accepted into evidence showing that the mother routinely provides the father with advance notice of appointments and sought input from the father but that he often did not respond to those inquiries (Tr. 1/31/24, pp. 60-64). 
E-mail's also showed that the mother routinely provided post-appointment feedback to the father about what she understood from the appointment about X's care (Tr. 1/31/24, pp. 64-65) including e-mails where the mother requested the father's feedback. 
In one e-mail dated November 30, 2023, the mother wrote to the father:
I understand from your e-mails that you want to be included in [X's] physical medical conversations, however, you have not responded to these very detailed missives that I send you regarding her health and well-being. These matters are important. Please, please, please respond.
E-mails in evidence showed that the father often did not respond to the mother's e-mails about X's medical care or that he only responds weeks later. When questioned about these lengthy delays the father testified that he often needs time to become comfortable discussing the proposed treatment plans which he testified is why he did not respond timely to e-mails from the mother about recommendation by the child's dermatologist to treat hormonal acne [Tr. 1/31/24, p. 68]. The father did show that he responded to some of the mother's requests for input and that at one time he suggested a dermatologist in California because he was so skeptical of any medical professional selected by the mother.
The father testified that he was, in effect, surprised that X was being treated by a dermatologist because he had not recognized many of the skin conditions that X was being treated for: he testified that his lack of responsiveness and involvement in X's dermatological care was because, in effect, he was overwhelmed for the idea that X could benefit from skin treatments including topical creams. The father testified "[s]o all of that sort of felt like a lot and so I wanted to sort of pull back" (Tr. 1/31/24, p. 92).The father conceded that instead of reaching out to the dermatologist to ask questions or seeking a second opinion he did nothing (Tr. 1/31/24, pp.91-92). 
The record established that the father often criticized the mother's selection of providers but rarely suggested alternative providers or offered to make other appointments for X [Tr. 1/31/24, pp. 65-66]. He conceded that when he asked for second opinions on some proposed treatment plans, he did not make any appointments for X to get a second opinion even after two (2) months had passed [Tr. 1/31/24, pp. 69-70]. 
He testified that he believed that he and the mother have "always been at odds" about X's medical care and education (Tr. 1/31/24, p. 93) and that he distrusted the course of treatment suggested by the dermatologist for X not because of the treatment plan itself but because that [*13]dermatologist also treated the mother. He testified that he "had concerns about [the doctor's] relationship with [the mother]" [Tr. 2/6/24, p. 38) but that "[i]f another dermatologist said the exact same things, it probably would have sat with me better" (Tr. 1/31/24, p. 93). The father conceded that he took no direct action to obtain a second opinion about X's dermatological care. The father testified that "I have never stopped X from taking any medication. I just don't know what the medications are" [Tr. 1/31/24, p. 71]. 
The father testified that he does not discuss X's ongoing struggles with acne with her because:
So how do I talk to my 14-year old daughter who is very shy and has, in my opinion, insecurities about her body, her appearance, how she fits in in school. I didn't feel comfortable (Tr. 1/31/24, p. 96).
In justifying his lack of direct action with X the father testified that:
. . . [L] is sort of . . . closed off with me in that particular way. You know, the truth of the matter is that L shares little with me as it relates to how she's feeling about stuff. She's not expressive about that (Tr. 1/31/24, p. 99). 

The testimony established that the father asked to attend X's annual physical exam when X was 14 years old (Tr. 1/31/24, pp. 56-60).
The father testified that he was unable to keep track of L's appointments because the mother made those appointments for X while also criticizing the mother's choice of providers and the timing of the appointments, she made during X's school day to attend medical, dental and dermatologist appointments [Tr. 2/6/24, pp. 14-15]. 
At the conclusion of the father's testimony the Court had one (1) question:
THE COURT: . . . [the mother] makes all of these appointments, makes all of these arrangements. The question is whether or not you received notice? Why are you not making these appointments and you not making these arrangements?
THE FATHER: I don't know. (Tr. 2/6/24, p. 40)
As is this Court's practice, the Court then asked all three attorneys if they had any follow-up questions for the father and there were none.

 Attorney for the Child
The attorney for the child, in her role as the child's advocate, supports the mother's application for permission to relocate with the child to L.A. and the Court has taken that into account. 

 The Law: Relocation
"In order to modify an existing court-ordered custody or parental access arrangement, there must be a showing that there has been a change in circumstances such that modification is required to protect the best interests of the child" (Morgan v Eckles, 214 AD3d 983, 984 [2 Dept.,2023]; see also Matter of Langenau v. Hargrove, 198 AD3d 650, 651, 156 N.Y.S.3d 37 [2 Dept.,2021]).
"[A] parent seeking to relocate with a child bears the burden of establishing by a preponderance of the evidence that the proposed move would be in the child's best interests" (Heppler v Oelsner, 217 AD3d 767, 768 [2 Dept.,2023]; see also Matter of Picitelli v. Carbone, [*14]208 AD3d 582, 583, 172 N.Y.S.3d 714 [2 Dept.,2022]).
"[E]ach relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child" (Rizea v Rizea, 218 AD3d 807, 809 [2 Dept.,2023]).
"In determining whether relocation is appropriate, the court must consider a number of factors including 'each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parents' and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements' " (Pavon v Perez, 213 AD3d 674, 675 [2 Dept.,2023]; see also Matter of Banks v. DeLeon, 174 AD3d 598, 599, 101 N.Y.S.3d 885 [2 Dept.,2019], quoting Matter of Tropea v. Tropea, 87 NY2d 727, 740—741, 642 N.Y.S.2d 575, 665 N.E.2d 145).
"Since custody determinations depend in large part on the trial court's assessment of the character and credibility of the parties and witnesses, that court's credibility findings are generally accorded deference, and its custody determinations will not be disturbed unless they lack a sound and substantial basis in the record" (Matter of Banks v. DeLeon, 174 AD3d at 599, 101 N.Y.S.3d 885 [internal quotation marks omitted]).
"The paramount concern in any custody ... determination is the best interests of the child, under the totality of the circumstances" (Matter of Pinto v. Pinto, 177 AD3d 746, 747, 114 N.Y.S.3d 370 [internal quotation marks omitted]). "Generally, a parent seeking to relocate with a child bears the burden of establishing by a preponderance of the evidence that the proposed move would be in the child's best interests" (Matter of Conroy v. Vaysman, 191 AD3d 977, 979, 142 N.Y.S.3d 99 [internal quotation marks omitted]).

Hearing
"Custody determinations ... require a careful and comprehensive evaluation of the material facts and circumstances in order to permit the court to ascertain the optimal result for the child" (S.L. v. J.R., 27 NY3d 558, 563, 36 N.Y.S.3d 411, 56 N.E.3d 193). Accordingly, "custody determinations should '[g]enerally' be made 'only after a full and plenary hearing and inquiry' " (id. at 563, 36 N.Y.S.3d 411, 56 N.E.3d 193, quoting Obey v. Degling, 37 NY2d 768, 770, 375 N.Y.S.2d 91, 337 N.E.2d 601; see Matter of Randall v. Diaz, 208 AD3d 1330, 1331, 174 N.Y.S.3d 605). "This general rule furthers the substantial interest, shared by the State, the children, and the parents, in ensuring that custody proceedings generate a just and enduring result that, above all else, serves the best interest of a child" (S.L. v. J.R., 27 NY3d at 563, 36 N.Y.S.3d 411, 56 N.E.3d 193; see Matter of Randall v. Diaz, 208 AD3d at 1331, 174 N.Y.S.3d 605). "[W]here ... facts material to the best interest analysis, and the circumstances surrounding such facts, remain in dispute, a custody hearing is required" (S.L. v. J.R., 27 NY3d at 564, 36 N.Y.S.3d 411, 56 N.E.3d 193; Matter of Fouyalle v. Jackson, 187 AD3d 907, 908, 130 N.Y.S.3d 706 [internal quotation marks omitted]). Here, the Court held an extensive hearing where both parties, represented by counsel, testified and the child was represented by an attorney for the child and the parties were both able to call witnesses.
One of the factors included in whether to allow relocation is "the degree to which [*15]the custodial parent's and child's life may be enhanced . . . emotionally . . . by the move." 
The Appellate Division, Second Department has held that "[w]hile the evidence showed that both parents love the child" relocation was granted to the parent found "better suited to provide for the child's overall well-being" (see Heppler v. Oelsner, 217 AD3d 767 [2 Dept.,2023], quoting Matter of Banks v DeLeon, 174 AD3d 598, 600 [2 Dept.,2019]). Here, the testimony and evidence show that the mother is the parent better suited to provide for the child's overall well-being. 
It is clear that both parents love X and that X deeply cares for both of her parents but the record supports the finding that X has a deep emotional bond and deep connection with the mother and that the mother is the parent who has and continues to be able to connect with X, understands and responds to X's shifting mental and health care needs and who will seek out these providers while the father admittedly appears to maintain a much more hands-off relationship with X and expects the mother to take care of many of X's physical and emotional needs. The record supports a finding that the mother is much better suited at understanding the child's physical and emotional needs as she gets older and that the mother is the parent who acts to ensure that the child receives not only the emotional support that she needs but also it is the mother who has and continues to be almost exclusively the parent who facilitates the child's healthcare needs.
The testimony and evidence in the record after trial further support the mother's position that as the years passed and X entered her tween and then teen years, she has increasingly struggled being separated from the mother. From the testimony, it appears that this struggle has been, in large part, because the father is unwilling or unable to communicate with X about things X finds important or to help X navigate developmental changes and find solutions such as addressing her changing skincare needs as she matures and the importance she put in her hair as it relates to her identity. 
The father conceded that he initially did not understand how important some things — such as her hair and skin  were to X's self-esteem and sense of well-being as she grew into her teen years. 
While the father clearly loves X it appears that he has not cultivated a relationship dynamic with her where he is willing or able to have necessary conversations with X about many of the developmentally appropriate transitions that X is experiencing as a 14-year-old or to recognize the import of certain experiences she is going through. 
The father conceded that he views X as "shy" and that he does not believe that X feels comfortable talking to him about a lot of emotional or personal feelings. While it is important that the father respects X's boundaries related to how much she feels comfortable sharing with him the Court also recognizes that X appears to be more comfortable disclosing this information to the mother. The parents are fortunate that the child communicates this information to the mother and the mother has made consistent efforts to share this information with the father so that he can be involved. The father should not, in effect, "punish" the mother because X feels comfortable confiding in her.
The father's view that the mother sharing information about X's needs such as any treatment plans and hair salon appointments, etc. is, in effect, meddling or overbearing behavior is misplaced. Furthermore, the father, in an e-mail in evidence chided the mother for not taking responsibility for scheduling X's hair appointments even when X was in his care. In an e-mail dated January 12, 2024 [Petitioner's Exh. 20], the mother requested that the father schedule a [*16]hair braiding appointment for X noting "X is very unhappy with her hair. Everyday she texts me or calls ma bout it. My sense is that she's really struggling with her self esteem . . . " In response, the father stated "Scheduling X's braiding appointments — and the arrival of her hair via mail — is something that you can and should manage. Not me." 
The father's clearly palpable and observable disdain for the mother makes him unable to recognize that her sharing this information with him was for X's best interest and an attempt to include him so that the parents had an opportunity to work together to support X. Had the father been able to recognize this support from the mother it is possible that he would not now find himself in this current position where he finds communicating about topics important to X so challenging. 
The mother appears more able to connect with X and to be more capable of responding to X's shifting emotional and physical needs. Both parents were credible in their love for their daughter. The father credibly testified he is unable at this time to connect with the daughter and did not dispute the mother's testimony that she and the daughter are able to communicate and connect about ongoing physical and emotional needs. In addition to scheduling and attending X's annual wellness visits and routine vaccination appointments, when X needed dental, ophthalmological, dermatological and mental health care it was the mother who appears to be the parent who is able to communicate with X about issues that X feels are important and that the mother is the parent best suited to provide for X's daily care and to respond constructively and in a timely manner to medical and mental health concerns that impact X. 
Given the current limits in communication between the father and X, it would not be in X's best interest to be left primarily in his care where neither the father, by his own admission, or X appear able to communicate freely about important issues and developments that may require intervention. Here, it is in X's best interest that X be primarily in the mother's daily care because the mother who has developed a deep connection with X and is able to communicate with her and support her emotional and physical developmental in age-appropriate ways.
By his own admission, the father concedes that he has not recognized certain developments impacting X or been able to identify them as how important they were to X until the mother told him. He also concedes that he is challenged by some of the child's needs including that he can become "overwhelmed" when presented with information about X's appointments and corresponding treatment plans, such as when the mother provided him with her understanding of the dermatologist's recommendations after an appointment for X's hormonal acne. The father testified that he did not respond to the mother's e-mail for nearly two (2) months because he was "overwhelmed" by the idea that the child may benefit from a dermatological routine. The father's testimony demonstrated that when he feels challenged by a development in X's life he often responds with inaction. 
In the recent case of Hernandez v. Viana, the Appellate Division, Second Department held that "the evidence established that the mother was the child's primary caretaker and was responsible for the child's medical and educational needs" and allowed relocation [213 AD3d 934, 936 [2 Dept.,2023]; see also Matter of Eckstein v. Young, 176 AD3d 813, 815, 112 N.Y.S.3d 227[2 Dept.,2019]). Here, the mother has clearly been the child's primary caretaker during most of her life including planning for her health care needs.
While there has been nothing stopping the father from being actively involved in these logistical needs for the child, he was unable to articulate why he has not taken an active role in X's care. 
It appears that the father not only leaves all the child's health care needs to the mother while simultaneously criticizing the mother's efforts and/or delaying the options presented by the mother by not responding or only responding weeks after the mother has asked for his input. When questioned about the basis for his objections to providers selected by the mother the father ultimately conceded that his objections were based not on the qualifications of the providers selected by the mother but, in effect, because he was skeptical of anyone the mother selected simply because she selected them without any further basis.
It appears that the father is unable or unwilling to put his vitriolic disdain for the mother aside to focus on X's needs and whether the proposed intervention is in X's best interest and, instead, he seeks to dismiss the mother and any option she proposes for addressing X's needs. The father appears more interested in undermining, dismissing and stonewalling the mother than in collaborating with the mother to ensure that X's best interests are met. The Court, who had the opportunity to observe the parents during this lengthy trial, notes that the father steadfastly refused to even look at the mother. The Court found credible the mother's testimony that the father will not speak with her directly about issues involving the child and that his e-mail responses to her are sporadic. The Court also found the father credible and forthright in his testimony that he would not consider any school for X outside New York City and his testimony that he would not speak directly with the mother.
During the trial, the Court observed throughout the mother's testimony that the father would not look at the mother and most of the time he actively stared away from her. His disdain for her was clearly observable and dismissive. His testimony, as well, was clear: his dislike of the mother and contempt for her was more important or as important as his relationship with the daughter. The mother on the other hand, for the most part, looked directly at the father during his testimony and engaged in active listening while looking directly at him. The Court finds that the father's hostility toward the mother together with his reluctance to communicate with the mother and his palpable disdain for her that allowing X to stay in his care would almost certainly have a negative impact on the relationship between X and the mother even if the father had demonstrated an ability to provide for the child's needs while in his care.
The father appears unable or unwilling to consider any options for X that do not comport with his preferences. This lack of openness to considering options does not demonstrate that the father is the parent best suited to assess what may be in X's best interest. The father refusing to even visit the MS when he was already in L.A. was an exercise of poor judgment and reflects the father's focus on what he believes is in his best interest without taking steps to learn about the options available for X before considering whether they are or are not in her best interest. The Court found this refusal a clear indicium of the father's position which clearly was: "My preference is more important than what my child might benefit from" — what message did the child get from such an unwillingness to even visit the school? This dismissiveness of the mother's request also showed that he is not willing to consider the mother's opinions unlike the mother who has demonstrated repeatedly that she seeks the father's input and considers his input when he responds to her.
One of the factors included in whether to allow relocation is "the degree to which the custodial parent's and child's life may be enhanced . . . educationally . . . by the move" (Pavon v Perez, 213 AD3d 674, 675 [2 Dept.,2023]). 
The Court finds nothing in the record that indicates that the child will not have an opportunity to flourish in a private school environment. Inasmuch as the father refused to visit [*17]MS or to even speak with anyone at MS he was unable to offer any testimony about the curriculum or opportunities at MS and how they may or may not benefit the child. As such, the Court only has the mother's testimony related to the academic profile of the private school in L.A. and why she believes it will provide a conducive learning environment where X is likely to thrive. The Court found the mother's testimony credible that the child tends to do best in smaller group environments and that she has demonstrated success in "all-girl" environments. The record is devoid of any indication that the child's educational opportunities would decrease if she relocated and attends MS.
One of the factors included in whether to allow relocation is the degree to which " . . . and child's life may be enhanced economically . . . " (Rizea v Rizea, 218 AD3d 807 [2 Dept.,2023]; see also Matter of DeCillis v DeCillis, 128 AD3d 818 [2 Dept.,2015]). 
Here, the mother testified credibly that her career opportunities are expanding and that her current contractual obligations require her to be in L.A. the majority of the year which also allows her greater access to securing future career opportunities. She testified that she would earn more than $1.32 million from April to July 2023 for one of her well-known streaming service projects and another $150,000 an episode for the next season of her other project and that these projects now require her to be in L.A. for filming almost year-round. The record at trial supported the mother's position that relocation to L.A. will economically enhance the child's life.
Another factor included in whether to allow relocation is " . . . the quality of the relationships between the child and the custodial and noncustodial parents . . . " (Matter of Banks v. DeLeon, 174 AD3d 598, 599, 101 N.Y.S.3d 885, quoting Matter of Tropea v. Tropea, 87 NY2d 727, 740—741, 642 N.Y.S.2d 575, 665 N.E.2d 145).
The Court finds the mother's testimony credible that she has consistently attempted to foster X's relationship with the father throughout the child's life and that she continued to do so even once she started working more in L.A. The Court finds that the record supports the mother's testimony that proposed relocation is not intended to interfere in the relationship between X and the father. The Court notes that the record supports the mother's testimony that she only sought to relocate X to L.A. after she first tried to maintain X's residence in Brooklyn by leaving X with the father in Brooklyn while she worked in L.A. but saw that X's mental and physical health appeared to deteriorate after X was in extended periods of time with the father. While the father contends that the mother's application to relocate is motivated exclusively by her own financial interest the Court found the mother's testimony credible that the mother was willing to step away from her burgeoning career opportunities in L.A. to return to Brooklyn to support X and that she attempted to have her character written off the streaming service show. While the mother believes that there is a financial advantage to her living in L.A. the Court finds credible the mother's testimony that she was willing to forego some of those opportunities to return to Brooklyn and that demonstrates her commitment to prioritizing X's best interest over her own potential career and financial opportunities. The Court does not adopt the father's contention that the mother's request to relocate is primarily financially motivated particularly where the mother initially tried to work in L.A. and travel back and forth to Brooklyn and only took the step of seeking to relocate after she believed developments made continuing with that arrangement was no longer in X's best interest. 
The Court notes the recent Appellate Division, First Department case of Chirag C. v Jaimie D. (— NYS3d —, 2024 WL 1558997)[April 11, 2024] where the Court granted the [*18]mother's application to relocate with the child finding that the mother had always been the child's primary caretaker who was responsible for the day-to-day tasks and who was more likely to foster a relationship between the father and the child and that:
[t]he record further demonstrated that the mother's motivation for relocating to Long Island permanently was financial, as opposed to a desire to get away from the father or to keep the child away from him (id. at *1).
Similarly here, the mother has primarily been the parent who took responsibility for the child's day-to-day physical and emotional well-being while the father took a passive role and when asked by the Court why he had not participated in the day-to-day logistics for the child's needs by making appointments himself, etc. the father was unable to provide any explanation. The Court notes that even though the father relied on the mother to do these important tasks he criticized her efforts. That, together with the father's unilateral decision to terminate the child's therapy without notifying the mother or obtaining her consent and his visible hostility and disdain for the mother demonstrate his inability or unwillingness to foster a relationship between the mother and the child if the child were not allowed to relocate with the mother.
The mother readily admitted that there have been times, although not systemically, that she did not exercise the best alternative when a visitation was delayed but her sincerity as to the choice and her clear regret about these lapses coupled with attempting to do her best while dealing with another parent who adamantly will not speak to her, readily communicate, or recognize the extent that the child's needs have not been met was clearly very frustrating.
While the rights of the parents are significant facts that must be considered in relocation cases, "it is the rights and needs of the child that must be accorded the greatest weight" (Matter of Cindy F. v. Aswad B.S., 176 AD3d 549 [1 Dept.,2019]).
The father's testimony primarily centered around how X's relocation would impact him and appeared rigidly fixated on maintaining the status quo for X without consideration to whether the status quo the parties established in 2013 when X was only two (2) years old continued to serve X's best interest. The father's testimony did not address 's current needs but focused on generalizations about what the parents envisioned for X more than a decade ago and how the shift would impact him.
The mother's testimony demonstrated a more nuanced understanding of X's shifting needs as she develops and a recognition that what is in X's best interest necessarily includes adjustments and adaptation. The mother provided specific testimony about X's personality and academic aptitudes and how those may be best cultivated.
The Court does not condone the mother's self-help of taking X to L.A. without the father's consent after the mother was eventually able to return to Brooklyn from L.A. during the pandemic. It is clear to the Court that the heightened anxiety about the health risks and uncertainty surrounding the pandemic had an impact on certain decisions made during the pandemic. This does not appear to be a pattern of behavior for the mother who, despite occasional lapses in judgment, appears to have continuously made consistent efforts to include the father in X's life. Furthermore, the Court found credible that the father also, at times, engaged in improper behavior in front of the child, including the incident the mother testified to regarding Christmas 2022.
The child's best interests can only be best facilitated when the parents are able not to let their personal feelings toward the other to interfere with their ability to communicate in a [*19]meaningful and constructive way.
One of the factors included in whether to allow relocation is " . . . the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements" (Pinto v Pinto, 177 AD3d 746, 797-780 [2 Dept.,2019]; see also Matter of Tropea v. Tropea, 87 NY2d 727, 740—41, 642 N.Y.S.2d 575, 665 N.E.2d 145 [1996]).
Here, the mother has demonstrated a recognition of the importance of fostering the relationship between X and the father. The father did not dispute the mother's testimony that throughout the child's life she has consistently facilitated the relationship between the father and X. There is no indication that the two disruptions to the father's parenting time during the pandemic were not isolated situations. The mother's proposed alternative parenting schedule would allow for regular parenting time between the father and X during holidays, school breaks and summer vacation and, to facilitate that access, the mother has represented that she is willing and able to pay for the requisite travel expenses for X to have that parenting time with the father. Under the facts and circumstances presented, there is clear feasibility of preserving the relationship between X and the father provided that the father exercises his parenting time and is receptive to any additional opportunities to spend time and communicate with X including when he may be in L.A. for work or social occasions. The Court notes that the testimony supports that given X's age she can communicate independently with the father using video calling and other methods.

The Child's Preference
It is well-established that "[w]hile the express wishes of [the] children are not controlling, they are entitled to great weight, particularly where their age and maturity would make their input particularly meaningful" (Gayle v Muir, 211 AD3d 942, 944 [2 Dept.,2022], quoting Matter of Shah v. Shah, 186 AD3d 1692, 1693, 132 N.Y.S.3d 45 [internal quotation marks omitted]). Here, the child is fourteen (14) years old and, while certainly not determinative, the Court has considered the position of the attorney for the child who supports the mother's application to relocate with X to L.A. (see Shannon J. v Aaron P., 111 AD3d 829 [2 Dept.,2013]) as well as the in camera interview.

Relocation Granted
In the recent case of Hernandez v. Viana, 213 AD3d 934 [2 Dept.,2023], the Appellate Division, Second Department upheld the trial court ruling that:
the evidence established that the mother was the child's primary caretaker and was responsible for the child's medical and educational needs (see Matter of Eckstein v. Young, 176 AD3d at 815, 112 N.Y.S.3d 227). Moreover, the mother established that the child's emotional and economic circumstances, as well as her educational opportunities, would be enhanced by the mother's proposed relocation (see Matter of Yu Chao Tan v. Hong Shan Kuang, 136 AD3d 933, 935, 25 N.Y.S.3d 339; Matter of Caruso v. Cruz, 114 AD3d 769, 772, 980 N.Y.S.2d 137; Matter of Clarke v. Boertlein, 82 AD3d 976, 977—978, 919 N.Y.S.2d 51; cf. Matter of Barker v. Rohack, 173 AD3d 1173, 1175, 105 N.Y.S.3d 478). Further, in making its determination, the court properly considered the effects of domestic violence upon the child (see Levitin v. Levitin, 167 AD3d 589, 590, 89 N.Y.S.3d 256). Although relocation will have an inevitable impact on the father's parenting time, the court directed a liberal parental access schedule that included alternating weekends, extended summer visits, and visits during school vacations, which [*20]will allow for the continuation of a meaningful relationship between the father and the child (see Matter of Banks v. DeLeon, 174 AD3d 598, 600, 101 N.Y.S.3d 885; Matter of Dockery v. Reid—O'Garro, 161 AD3d 1147, 1148—1149, 77 N.Y.S.3d 480)."
Here, the Court finds that the mother has met her burden of establishing that the proposed move would be in X's best interest including that the move will emotionally and educationally enhance X's life; the move will not negatively impact the quality of X's future contact with the father; and that it is feasible to preserve the relationship between the father and X with a suitable visitation schedule (see Lecaros v Lecaros, 127 AD3d 1037 [2 Dept.,2015]). 
The Court, having considered all of the facts and circumstances, finds that while any decision on this relocation application — whether leaving X in Brooklyn or allowing her to relocate to L.A. — will impact X and the families she is a part of that love and care for her, as detailed herein, X is deeply bonded to the mother and the mother has met her burden of showing that relocation is in X's best interest and has demonstrated that the move will not undermine the ability of X to have a meaningful relationship with the father but offering an extended parenting schedule that will actually expand the parenting time between X and that father. 
The petitioner mother has demonstrated a sincere and clear intention that she wants the father to be an actively involved parent in the child's life. The Court found the mother's testimony credible. It is also credible that the mother has actively attempted to co-parent with the father despite how difficult the father has made that effort and how resistant he has been to communicate with the mother. The father has rejected the mother's repeated efforts to include him: the father appears to shut down or ignore the mother's efforts to communicate and/or views these efforts as overwhelming. The father clearly takes the position that unless the mother adopts his way that he will not consider or participate in any option that is not his. 
The mother is financially able for the first time to provide for the child to a level that she has not been economically situated to do before. As such, for the first time, the mother is now not as dependent on the father's financial support as she has been throughout the child's life.
The child has spent her freshman year at the New York City public high school. It was disingenuous for the father to try to use the fact that X has started high school in New York City as a reason why she should not be allowed to relocate inasmuch as it was the father's refusal to consider any alternative that resulted in X starting high school in New York. The mother received an extension on the child's offer of a seat at MS and represented that she paid a deposit to hold the child's acceptance until May 1, 2024 for the 2024-2025 academic year. The Court, recognizing that the child's placement in MS required a decision prior to May 1, expedited this decision. The Court was concerned that the child would lose the acceptance at MS if this matter was not dealt with expeditiously. The mother asserted the significant financial undertaking the mother must make by May 1, 2024.
The mother is granted permission to relocate with the child to California and to enroll the child in the L.A. private high school. To enable the child to finish her freshman year in her current high school and so that the father has the summer parenting time with X as detailed in the mother's proposed parenting schedule, the child shall relocate with the mother to California two (2) weeks prior to the start of the academic year at MS. The Court believes it is important for the child to be with the mother and the Court is concerned that if the child is not permitted to relocate with the mother that her physical and emotional needs will not be adequately met at this time. 

 Parenting Time
The mother submitted a proposed parenting time schedule based on the MS 2023-2024 academic calendar [Petitioner's Exh. 10]. The father failed to put forth any alternative parenting time schedule: he was unwilling to consider any relocation. As such, the only proposed schedule before the Court is the one proffered by the mother. As such, there is a failure of proof on the father's part related to any proposed parenting schedule and the mother's proposed parenting schedule will be accepted as proposed [Petitioner's Exh. 10] which includes approximately one hundred thirty (130) days of parenting time between the child and the father which far exceeds the father's current parenting time of approximately seventy-four (74) days annually under the parties' parenting agreement [Petitioner's Exh. 9].[FN5]
 
The mother's proposed parenting schedule structured around the MS private school academic calendar provides the father parenting time with X on Thanksgiving; Christmas; New York Eve and MLK, Jr.; Presidents Day Holiday; Grading Day/Spring Break; Spring Holiday; and the June-August school summer vacation.[FN6]

The father may, within thirty (30) days of service of notice of entry of this decision and order, seek an amendment to the parenting schedule in the future if he seeks to change the parenting schedule during holidays and school breaks and the parents are unable to reach an agreement. 
This shall constitute the decision and order of the Court.
ENTER:
HON. JEFFREY S. SUNSHINE
J.S.C.

Footnotes

Footnote 1:The minutes of that in camera were sealed.

Footnote 2:The only information as to the mother's age is in a statement of net worth filed by the father in the underlying custody action which lists both parties' ages as the same as of September 2012.

Footnote 3:The Court has not included quotes from these texts because they were from the parties' child.

Footnote 4:In an attempt to help the parents resolve this issue by speaking with the child about her high school options the Court lifted the temporary restraining order that the parents not discuss the litigation with the child so that the parents could jointly speak with the child about the available options; however, the father refused to talk with the child with the mother. The lifting of the temporary restraining order was over the objections of the father.

Footnote 5:Not including the father's weekly dinner visit with the child under the current schedule.

Footnote 6:Based on the MS private school in L.A. academic calendar the last day of school is at the end of May.